

EXHIBIT C

# FACTORING AND SECURITY AGREEMENT

THIS FACTORING AND SECURITY AGREEMENT ("Agreement") is made as of 2/5/2024 ("Effective Date"), by and between **Shopno I, LLC**, a New York limited liability company dba Your Dream Homecare (hereinafter referred to as "Seller") and **Encore Funding II, LLC**, an Ohio limited liability company (hereinafter referred to as "Purchaser").

1. **Definitions and Index to Definitions**. The following terms used herein shall have the following meaning. All capitalized terms not herein defined shall have the meaning set forth in the Uniform Commercial Code:

    1.1. "Account" means a right to payment of a monetary obligation resulting from labor and/or services rendered by Seller's business in the ordinary course.

    1.2. "Account Debtor" means an Account Debtor of Seller which owes a Purchased Account to Purchaser.

    1.3. "Accounting Period" means the period beginning Monday and ending Sunday during each week of the Term of the Agreement.

    1.4. "Affiliate" means with respect to any Person, each other Person that owns or controls directly or indirectly the Person, any Person that controls or is controlled by or is under common control with the Person, and each of that Person's senior executive officers, directors, partners and, for any Person that is a limited liability company, that Person's managers and members.

    1.5. "Assignment Sheet" means a form(s) wherein Purchaser acknowledges its purchase and Seller's assignment of Accounts offered by Seller for purchase under the terms of this Agreement.

    1.6. "Avoidance Claim" means any claim that any payment received by Purchaser is avoidable under the Bankruptcy Code or any other debtor relief statute.

    1.7. "Clearance Days" means three (3) banking days.

    1.8. "Closed" means the closing of a Purchased Account upon receipt of full payment by Purchaser from a Payor or from the Seller (including its being charged to the Reserve Account).

    1.9. "Collateral" means all Seller's now owned and hereafter acquired Accounts, Chattel Paper, Inventory, Equipment, Instruments, Deposit Accounts, Investment Property, Documents, Letter of Credit Rights, Commercial Tort Claims, and General Intangibles.

    1.10. "Complete Termination" means the satisfaction of the following conditions, as reasonably determined by Purchaser:

        1.10.1 Payment in full of all Obligations of Seller to Purchaser;

        1.10.2 If Purchaser has issued or caused to be issued guarantees, promises, or letters of credit on behalf of Seller, acknowledgement from any beneficiaries thereof that Purchaser or any other issuer has no outstanding direct or contingent liability therein; and

DocuSign Envelope ID: 973E56DE-25AE-4805-83CB-B1B7521076A



    1.10.3. Seller's execution and delivery to Purchaser of a General Release in the form of Exhibit A attached hereto.

  1.11. "Daily Fee" means the "Daily Fee Percentage" (as set forth in Exhibit B to this Agreement, subject to any Prime Rate Adjustment) multiplied by the Face Amount of a Purchased Account that remains unpaid, in whole or in part, on the Daily Fee Accrual Date (as set forth in Exhibit B to this Agreement) and each day thereafter until the Purchased Account is Closed.

  1.12. "Direct Payroll Costs" means all gross wages earned by Employees and all of Seller's (as employer) share of federal social security taxes, federal unemployment taxes and contributions, and state unemployment taxes attributable to the wages of Employees, and any other direct payroll taxes or expenses which may be levied, including any applicable sales tax as may be required.

  1.13. "Eligible Account" means an Account that is acceptable for purchase as determined by Purchaser in the exercise of its reasonable sole credit or business judgment.

  1.14. "Employees" means those individuals who serve as employees of Seller and for whom Seller is employer of record, and those employees on assignment by Seller in the ordinary course of Seller's business.

  1.15 "Exposed Payments" means payments received by Purchaser from, or for the account of, Payor that has become subject to a bankruptcy proceeding, to the extent that such payments cleared the Payor's deposit account within ninety (90) days of the commencement of said bankruptcy proceeding.

  1.16. "Face Amount" means the face amount due on an Account at the time of purchase.

  1.17. "Funding Fee" means the "Funding Fee Percentage" (as set forth in Exhibit B to this Agreement, subject to the Prime Rate Adjustment) multiplied by the Face Amount of a Purchased Account on the Purchase Date.

  1.18. "Invoice" means the document that evidences or is intended to evidence an Account. Where the context so requires, reference to an Invoice shall be deemed to refer to the Account to which it relates.

  1.19. "Invoice Date" means the date on which Seller, in the ordinary course of business, generated an Invoice subsequent to the performance of labor and/or services rendered by Seller for Obligor.

  1.20. "Late Charge" means the "Late Charge Percentage" (as set forth in Exhibit B to this Agreement) multiplied by the Face Amount of each Purchased Account which remains unpaid, in whole or in part, on the Late Payment Date, and each day thereafter until the Purchased Account is Closed.

  1.21. "Minimum Billing" means an aggregate dollar value of Accounts offered for sale to Purchaser equal to ten thousand dollars ($10,000) in Accounts per week.

  1.22. "Obligations" means all present and future obligations owing by Seller to Purchaser whether arising hereunder or otherwise, and whether arising before, during or after the commencement of any bankruptcy case in which Seller is a Debtor.

Electronically Filed 02/14/2025 15:44 / / CV 25 112182 / Confirmation Nbr. 3407002 / CLTXT

Shopno I, LLC                                                        2



1.23. "Obligor" means the party obligated to make payments with respect to any Purchased Account. hereunder or otherwise, including but not limited to obligations that arise after the commencement of any bankruptcy proceeding in which Seller is a debtor.

1.24. "Parties" means Seller, Purchaser, and any Guarantors.

1.25. "Payor" means an Account Debtor, Obligor on an Account, or any other Person that makes Account payments on behalf of an Obligor.

1.26. "Periodic Fee" means the Periodic Fee Percentage (as set forth in Exhibit B to this Agreement, subject to the Prime Rate Adjustment) multiplied by the Face Amount of each Purchased Account which remains unpaid, in whole or in part, on the "Periodic Fee Accrual Date(s)" (as set forth in Exhibit B to this Agreement) until the Purchased Account is Closed.

1.27. "Person" means any individual, sole proprietorship, partnership, limited liability company, joint venture, company, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or government agency.

1.28. "Prime Rate of Interest" means the prime rate of interest as set forth in The Wall Street Journal.

1.29. "Prime Rate Adjustment" means an increase to the Funding Fee, Daily Fee, and Periodic Fee proportional to any increase to the Prime Rate of Interest occurring after the Effective Date, and which shall be effective as of the date of the increase to the Prime Rate of Interest.

1.30. "Purchase Date" means the date on which Seller has been advised in writing that Purchaser has agreed to purchase an Account as evidenced by Seller's receipt of the Assignment Sheet notating the Schedule of Accounts purchased by Purchaser or when funds are received by Seller, whichever is earlier.

1.31. "Purchase Price" means the Face Amount of a Purchased Account less the Funding Fee.

1.32. "Purchased Accounts" means, at any point in time, the Accounts purchased by Purchaser hereunder that have not been Closed and are not Repurchased Accounts.

1.33. "Repurchased Account" means an Account that has been repurchased by Seller pursuant to the payment by Seller to Purchaser of the then unpaid Face Amount plus all earned fees due to Purchaser for such Account.

1.34. "Required Reserve Amount" means the sum of the "Reserve Percentage" (as set forth in Exhibit B to this Agreement) multiplied by the Face Amount of the Purchased Accounts, plus the portion of the Special Reserve Amount, if any, that Purchaser has either received from Seller or otherwise set off in accordance with Sections 3.4 and 28, less any Obligations that Purchaser sets off in accordance with Section 26.

1.35. "Reserve Account" means a bookkeeping account on the books of Purchaser representing the portion of the Purchase Price which has not been paid by Purchaser to Seller, maintained by Purchaser to ensure Seller's performance with the provisions of the Agreement.



      1.36.   "Reserve Shortfall" means the amount by which the Reserve Account is less than the Required Reserve Amount.

      1.37.   "Schedule of Accounts" means a form approved in form by Purchaser, or otherwise accepted by Purchaser, wherein Seller lists such of its Accounts as it requests that Purchaser purchase under the terms of this Agreement.

      1.38.   "Term" means the term of this Agreement (as set forth in Exhibit B of this Agreement).

2.    **Sale; Purchase Price; Billing**

      2.1.   Assignment and Sale.

          2.1.1.   Seller shall offer to sell exclusively to Purchaser as absolute owner, with full recourse, all of Seller's Accounts and shall list the same from time to time on Seller's Schedule of Accounts.

          2.1.2.   Each Schedule of Accounts shall be accompanied by such documentation supporting and evidencing the Account, as Purchaser shall from time to time request.

          2.1.3.   Purchaser may, but need not, purchase from Seller such Accounts as Purchaser determines to be Eligible Accounts. Any Accounts that Purchaser does not affirmatively agree to purchase from Seller shall be deemed to have been rejected for purchase by Purchaser without any further action on behalf of Purchaser.

          2.1.4.   Purchaser shall pay the Purchase Price of a Purchased Account, less any amounts due to Purchaser from Seller, within two (2) business days of the Purchase Date, whereupon the Accounts shall be deemed purchased hereunder.

          2.1.5.   Each Account that Purchaser agrees to purchase hereunder shall be deemed to have been purchased upon Purchaser's payment to Seller of the Purchase Price less the Required Reserve Amount and any other amounts due to Purchaser, for such Account.

          2.1.6.   Subject to the terms and conditions of this Agreement, Purchaser is authorized to purchase Accounts in accordance with the telephonic, facsimile, electronic mail, or other instructions of anyone purporting to be an officer, employee or representative of Seller.

      2.2.   Following the purchase hereunder of any Purchased Account, with respect to any Account, Obligors for the Purchased Account will be instructed by Purchaser and Seller to make payments to Purchaser with remittance advice to "EF for the benefit of Seller" and sent to P.O. Box 789087, Philadelphia, PA 19178-9087. Further, all invoices issued by Seller and/or Purchaser for any Purchased Account shall include the following statement:

> "This account receivable has been assigned to and is owned by or subject to a security interest of Encore Funding II, LLC and is payable only in United States Dollars. All payments shall be made payable to EF F/B/O Shopno I, LLC, and sent to P.O. Box 789087, Philadelphia, PA 19178-9087."



3. **Reserve Account and Adjustments.**

    3.1. Seller shall pay to Purchaser on demand the balance of any Reserve Shortfall. The balance due and owing shall constitute indebtedness which is immediately due and payable by Seller to Purchaser.

    3.2. Purchaser shall pay to Seller any amount by which the balance of the Reserve Account exceeds the Required Reserve Amount by the end of the next full Accounting Period.

    3.3. Upon the repurchase of any Purchased Account in accordance with Section 7, Purchaser shall reduce the Reserve Account by the Required Reserve Amount applicable to such Repurchased Account.

    3.4. From time to time, in its sole discretion, Purchaser may establish and revise an amount to reflect events, conditions, contingencies or risks that Purchaser determines in good faith may affect the collectability of Purchased Accounts or which may reflect adversely upon the adequacy of the Reserve Account (such Amount, the "Special Reserve Amount"). The Special Reserve Amount shall be payable by Seller to Purchaser, and Purchaser may (i) require Seller pay to Purchaser, as a reimbursement of any previously paid Purchase Price, the amount of such Special Reserve Amount upon receipt of written notice to Seller, or (ii) set off any amounts owed from Purchaser to Seller by all or a portion of such Special Reserve Amount, pursuant to Section 28.

    3.5. Purchaser shall have no obligation to pay Seller any amounts from the Reserve Account prior to Complete Termination, unless otherwise specifically set forth in this Agreement.

4. **Clearance Days.** For all purposes under this Agreement, Clearance Days will be added to the date on which the Purchaser receives payment.

5. **Exposed Payments.**

    5.1. Upon termination of this Agreement, Seller shall pay to Purchaser (or Purchaser may retain), to hold in a non-segregated, non-interest bearing account, the amount of all Exposed Payments (the "Preference Reserve")

    5.2. Purchaser may charge the Preference Reserve with the amount of any Exposed Payments that Purchaser pays to the bankruptcy estate of the Payor that made the Exposed Payment, on account of a claim asserted under Section 547 of the Bankruptcy Code.

    5.3. Purchaser shall refund to Seller from time-to-time that balance of the Preference Reserve for which a claim under Section 547 of the Bankruptcy Code can no longer be asserted due to the passage of the statute of limitations, settlement with the bankruptcy estate of the Payor, or otherwise.

6. **Fees and Expenses.** Seller shall pay to Purchaser:

    6.1. **Funding Fee.** The Funding Fee, on the day on which a Purchased Account is purchased.

    6.2. **Periodic Fee.** The Periodic Fee, on the day on which a Purchased Account is Closed.

    6.3. **Daily Fee.** The Daily Fee, on the day on which a Purchased Account is Closed.



6.4. **Late Charge**. The Late Charge, on demand, on all past due amounts due from Seller to Purchaser hereunder.

6.5. **Misdirected Payment Fee.** 15% of the amount of any payment on account of a Purchased Account which has been received by Seller and not delivered in kind to Purchaser on the next business day following the date of receipt by Seller.

6.6. **Missing Notation Fee.** 15% of the amount of any Invoice that is sent by Seller to a Payor that does not contain the notice as required by Section 2.2 hereof. It is recognized that the costs imposed upon Purchaser by the Seller's action or inaction resulting in the imposition of this fee are difficult to ascertain, and this fee represents the good faith effort to compensate Purchaser without imposing upon the parties the expensive burden of litigating that cost, and is the agreed liquidated damages that result therefrom.

6.7. **Early Termination Fee.** The Early Termination Fee, on the Early Termination Date, in the event that Seller terminates this Agreement other than at the end of a Term, and further described in Section 20.

6.8. **Out-of-pocket Expenses**. The out-of-pocket expenses directly incurred by Purchaser in the administration of this Agreement such as wire transfer fees, postage and audit fees. Seller shall not be required to pay for more than four (4) audits per twelve-month period.

7. **Repurchase Of Accounts**. Upon demand of Purchaser or at Purchaser's option, by Purchaser's charge to the Reserve Account, Seller shall repurchase a Purchased Account, by payment of the then unpaid Face Amount thereof together with any unpaid fees relating to the Purchased Account, where:

7.1. Any Purchased Account, the payment of which has been disputed by the Payor or the Account Debtor obligated thereon, and Purchaser being under no obligation to determine the bona fides of such dispute;

7.2. Any Purchased Account regarding which Seller has breached any warranty as set forth in Section 14.4.

7.3. Any Purchased Account owing from an Account Debtor or Payor which (i) in Purchaser's sole judgment has become insolvent or (ii) which has indicated an inability or unwillingness to pay the Purchased Account when due;

7.4. All Purchased Accounts upon the occurrence of an Event of Default, or upon the expiration of the Term of this Agreement;

7.5. Any Purchased Account that remains unpaid following the Late Payment Date.

8. **Security Interest**.

8.1. As collateral securing the Obligations, Seller grants to Purchaser a continuing first priority security interest in the Collateral, and authorizes Purchaser or its representative, without notice to Seller, to file financing statements or take any other action required to perfect Purchaser's security interest in the Collateral.

8.2. Notwithstanding the creation of this security interest, the relationship of the parties shall be that of Purchaser and Seller of Accounts, and not that of lender and borrower.



9. **Authorization to Purchaser.**

    9.1. Seller irrevocably authorizes Purchaser at Seller's expense, to exercise at any time any of the following powers until all of the Obligations have been paid in full:

        9.1.1. Receive, take, endorse, assign, deliver, accept and deposit, in the name of Purchaser or Seller, any and all proceeds of any Collateral.

        9.1.2. Take or bring, in the name of Purchaser or Seller, all steps, actions, suits or proceedings deemed by Purchaser necessary or desirable to effect collection of or other realization upon Purchaser's Accounts;

        9.1.3. Pay any sums necessary to discharge any lien or encumbrance which is senior to Purchaser's security interest in any Collateral of Seller, which sums shall be included as Obligations hereunder, and in connection with which sums the Late Charge shall accrue and shall be due and payable;

        9.1.4. File in the name of Seller or Purchaser or both:

            9.1.4.1. Mechanics lien or related notices, or

            9.1.4.2. Claims under any payment bond, in connection with goods or services sold by Seller in connection with the improvement of realty.

        9.1.5. Notify any Obligor with respect to any Account, that the underlying Account has been assigned to Purchaser by Seller and that payment thereof is to be made to the order of and directly and solely to Purchaser;

        9.1.6. Communicate directly with Obligors to verify the amount and validity of any Account created by Seller.

        9.1.7. File, and update from time-to-time as required by Purchaser, IRS forms 2848 and 8821.

        9.1.8. File any initial financing statements and amendments thereto that:

            9.1.8.1. Indicate the Collateral as all assets of the Seller or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC, or as being of an equal or lesser scope or with greater detail;

            9.1.8.2. Contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether the Seller is an organization, the type of organization, and any organization identification number issued to the Seller;

            9.1.8.3. Contain a notification that the Seller has granted a negative pledge to the Purchaser, and that any subsequent lienor may be tortuously interfering with Purchaser's rights;



9.1.9. Advise third parties that any notification of Seller's Obligors will interfere with Purchaser's collection rights;

9.1.10. Accept, endorse and deposit on behalf of Seller any checks tendered by an Obligor "in full payment" of its obligation to Seller. Seller shall not assert against Purchaser any claim arising therefrom, irrespective of whether such action by Purchaser effects an accord and satisfaction of Seller's claims, under §3-311 of the Uniform Commercial Code.

9.1.11. After an Event of Default, extend the time of payment of, compromise or settle for cash, credit, return of merchandise, and upon any terms or conditions, any and all Accounts and discharge or release any Obligor, without affecting any of the Obligations;

10. **ACH Authorization**. In order to satisfy any of the Obligations, Seller authorizes Purchaser to initiate electronic debit or credit entries through the ACH system to any deposit account maintained by Seller.

11. **Covenants By Seller**.

11.1. As a condition precedent to Purchaser's performance under this Agreement, Seller agrees:

11.1.1. To timely pay all Direct Payroll Costs with the Purchased Accounts and any applicable burden including, but not limited to, Social Security, Medicare, and Federal and State Unemployment taxes, and Seller shall provide Purchaser with such proof of payment as Purchaser may require. The foregoing notwithstanding, in the event that there is any applicable Full Service Exhibit to this Agreement, this section shall not apply.

11.1.2. To timely pay all workers' compensation premiums, provide Purchaser with such proof of payment as Purchaser may require, and to take all steps necessary to name Purchaser as an additional insured or certificate holder on Seller's workers' compensation policy.

11.2. After written notice by Purchaser to Seller, and automatically, without notice, after an Event of Default, Seller shall not (a) grant any extension of time for payment of any of its Accounts, (b) compromise or settle any of its Accounts for less than the full amount thereof, (c) release in whole or in part any Payor, or (d) grant any credits, discounts, allowances, deductions, return authorizations or the like with respect to any of the Accounts.

11.3. From time to time as requested by Purchaser, Purchaser or its designee shall have access, during reasonable business hours if prior to an Event of Default and at any time if on or after an Event of Default, to all premises where Collateral is located for the purposes of inspecting (and removing, if after the occurrence of an Event of Default) any of the Collateral, including Seller's books and records, and Seller shall permit Purchaser or its designee to make copies of such books and records or extracts therefrom as Purchaser may request. Without expense to Purchaser, Purchaser may use any of Seller's personnel, equipment, including computer equipment, programs, printed output and computer readable media, supplies and premises for the collection of accounts and realization on other Collateral as Purchaser, in its sole discretion, deems appropriate. Seller hereby irrevocably authorizes all accountants and third parties to disclose and deliver to Purchaser at Seller's expense all financial information, books and records, work papers, management reports and other information in their possession relating to Seller.

11.4. Each guarantor, principal, and/or director, individually, undertakes to assure Purchaser that each and every customer of Seller for whose accounts are offered for purchase hereunder, are independent, non-related business enterprises. Non-related means that Seller, its principals, officers,



relations, employees or agents have no direct or indirect ownership, interest or affiliation with the Obligor or Payor. Each guarantor, principal and/or director, individually and in their respective capacities for Seller confirm that Seller will not obtain factoring or other financing for Direct Payroll Costs and Accounts Receivable generated by its business from any other source, nor shall any Affiliated Person obtain such factoring or financing.

11.5. Upon Purchaser's request, Seller shall deliver to Purchaser quarterly financial statements within forty-five (45) days after the end of each fiscal quarter in form and detail satisfactory to Purchaser.

11.6. Upon Purchaser's request, Seller and each Guarantor shall provide Purchaser with copies of their most recent annual tax returns and updated personal financial statements.

11.7. Seller shall not create, incur, assume or permit to exist any lien upon or with respect to any assets in which Purchaser now or hereafter holds a security interest.

11.8. Seller agrees to operate it business in accordance with this Agreement and in full compliance with all applicable federal, state and local laws, rules and regulations.

11.9. Notwithstanding Seller's obligation to pay the Misdirected Payment Fee, Seller shall pay to Purchaser on the next banking day following the date of receipt by Seller the amount of any payment on account of a Purchased Account.

11.10. Seller agrees to cooperate with Purchaser and to provide reasonable assistance to Purchaser, to the extent requested, to enable Purchaser to exercise its rights in the Purchased Accounts and as otherwise set forth in this Agreement.

12. **Avoidance Claims.** In addition to any remedies available to Purchaser under this Agreement or applicable law, Seller shall indemnify Purchaser from any loss arising out of the assertion of any Avoidance Claim, and shall pay to Purchaser on demand the amount thereof. Seller shall notify Purchaser within two (2) business days of it becoming aware of the assertion of an Avoidance Claim. This provision shall survive termination of this Agreement.

13. **Account Disputes**. Seller shall notify Purchaser promptly of and, if requested by Purchaser, will settle all disputes concerning any Purchased Account, at Seller's sole cost and expense. Purchaser may, but is not required to, attempt to settle, compromise, or litigate (collectively, "Resolve") the dispute upon such terms, as Purchaser in its sole discretion deem advisable, for Seller's account and risk and at Seller's sole expense. Upon the occurrence of an Event of Default Purchaser may Resolve such issues with respect to any Account of Seller.

14. **Representation and Warranties**. Seller represents and warrants to Purchaser as of the Effective Date and as of each Purchase Date thereafter, as follows:

14.1. It is fully authorized to enter into this Agreement and to perform hereunder;

14.2. This Agreement constitutes its legal, valid and binding obligation, enforceable against Seller in accordance with the terms herein.

14.3. Seller is duly organized, validly existing, and in good standing (or comparable concept in the applicable jurisdiction) under the laws of its state or jurisdiction of incorporation or organization, and is duly qualified and authorized to do business and is in good standing as a foreign entity in any other jurisdiction in which it conducts its business.



14.4. The Purchased Accounts are and will remain:

14.4.1. Bona fide existing obligations created by the sale and delivery of goods or the rendition of services in the ordinary course of Seller's business;

14.4.2. Unconditionally owed and payable to Purchaser without defenses, disputes, offsets, counterclaims, or rights of return or cancellation.

14.4.3. Not sales to any entity that is Affiliated with Seller directly or indirectly or in any way not an "arm's length" transaction.

14.5. Seller has not received notice or otherwise learned of actual or imminent bankruptcy, insolvency, or material impairment of the financial condition of any applicable Obligor regarding Purchased Accounts.

15. **Indemnification.** Seller agrees to indemnify Purchaser against and save Purchaser harmless from any and all manner of suits, claims, liabilities, demands and expenses (including reasonable attorneys' fees and collection costs) resulting from or arising out of this Agreement, whether directly or indirectly, including the transactions or relationships contemplated hereby (including the enforcement of this Agreement), and any failure by Seller to perform or observe its Obligations under this Agreement.

16. **Disclaimer of Liability.** In no event shall Purchaser be liable to Seller for any lost profits, lost savings or other consequential, incidental or special damages resulting from or arising out of or in connection with this agreement, the transactions or relationships contemplated hereby or purchaser's performance or failure to perform hereunder, even if purchaser has been advised of the possibility of such damages.

17. **Default.**

17.1. **Events of Default**. The following events will constitute an "Event of Default" hereunder: (a) Seller defaults in the payment of any Obligations or in the performance of any provision hereof or of any other agreement now or hereafter entered into with Purchaser, or any warranty or representation contained herein proves to be false in any way, whether material or immaterial, (b) Seller grants a security interest in the Collateral or otherwise allows the Collateral to become encumbered by any party other than Purchaser, (c) Seller or any guarantor of the Obligations becomes subject to any debtor-relief proceedings, (d) any such guarantor fails to perform or observe any of such Guarantor's obligations to Purchaser or shall notify Purchaser of its intention to rescind, modify, terminate or revoke any guaranty of the Obligations, or any such guaranty shall cease to be in full force and effect for any reason whatever, (e) If there occurs a material adverse change in the business, operations, or condition (financial or otherwise) of Seller or material adverse change in the financial condition of any Guarantor, (f) failure to meet the Minimum Billing requirement for any four (4) week period once more than six (6) months have elapsed from the beginning of the Term, (g) Purchaser for any reason, in good faith, deems itself insecure with respect to the prospect of repayment or performance of the Obligations.

17.2. **Waiver of Notice. PURCHASER'S FAILURE TO CHARGE OR ACCRUE INTEREST OR FEES AT ANY "DEFAULT" OR "PAST DUE" RATE SHALL NOT BE DEEMED A WAIVER BY PURCHASER OF ITS CLAIM THERETO.**

17.3. **Effect of Default.**



       17.3.1. Purchaser shall notify Seller in writing of an Event of Default as soon as practicable after Purchaser's discovery thereof. If Seller fails to cure an Event of Default within thirty (30) days of said notice, in addition to any rights Purchaser has under this Agreement or applicable law, Purchaser may immediately terminate this Agreement, at which time all Obligations, including any applicable Early Termination Fee, shall immediately become due and payable.

       17.3.2. The foregoing notwithstanding, where, in the good-faith judgment of Purchaser, an Event of Default is the result of fraud or conversion on the part of Seller, in addition to any rights Purchaser has under this Agreement or applicable law, Purchaser may immediately terminate this Agreement, at which time all Obligations shall immediately become due and payable.

       17.3.3. Upon the occurrence of any Event of Default, all applicable fees with respect to any outstanding Obligation shall continue to accrue and remain payable on demand.

       17.3.4. Termination of the Agreement by Purchaser resulting from an Event of Default shall constitute an Early Termination.

18.    **Account Stated**. Purchaser shall render to Seller a statement setting forth the transactions arising hereunder. Each statement shall be considered correct and binding upon Seller as an account stated, except to the extent that Purchaser receives, within sixty (60) days after the mailing of such statement, written notice from Seller of any specific exceptions by Seller to that statement, and then it shall be binding against Seller as to any items to which it has not objected.

19.    **Amendment and Waiver**. Only a writing signed by all parties hereto may amend this Agreement. No failure or delay in exercising any right hereunder shall impair any such right that Purchaser may have, nor shall any waiver by Purchaser hereunder be deemed a waiver of any default or breach subsequently occurring. Purchaser's rights and remedies herein are cumulative and not exclusive of each other or of any rights or remedies that Purchaser would otherwise have.

20.    **Termination; Effective Date**.

       20.1.    This Agreement shall be effective on the Effective Date, shall continue for the Term, and shall be automatically extended for successive Terms unless Seller shall provide at least sixty (60) days but no more than ninety (90) days before the end of the then current Term via written notice to Purchaser's General Counsel of its intention to terminate whereupon this Agreement shall terminate at the end of the Term.

       20.2.    Purchaser may also terminate this Agreement by providing at least sixty (60) days but no more than ninety (90) days before the end of the then current Term via written notice to Seller.

       20.3.    Should Seller terminate the Agreement in any fashion other than as set forth in this Section 20, Seller shall provide at least thirty (30) days prior written notice from the date set forth in said notice (an "Early Termination Date"). In the event of any such termination, Seller will pay Purchaser a fee equal to the average monthly fees earned by Purchaser for the three (3) months having the highest total fees earned in the preceding twelve (12) month period, multiplied by the number of months (or portions thereof) between the Early Termination Date and end of the current Term.

21.    **No Lien Termination without Release**. In recognition of the Purchaser's right to have its attorneys' fees and other expenses incurred in connection with this Agreement secured by the Collateral, notwithstanding payment in full of all Obligations by Seller, Purchaser shall not be required to record any



terminations or satisfactions of any of Purchaser's liens on the Collateral unless and until Complete Termination has occurred. **Seller understands that this provision constitutes a waiver of its rights under §9-513 of the UCC.**

22. **Conflict**. Unless otherwise expressly stated in any other agreement between Purchaser and Seller, if a conflict exists between the provisions of this Agreement and the provisions of such other agreement, the provisions of this Agreement shall control.

23. **Severability**. In the event any one or more of the provisions contained in this Agreement is held to be invalid, illegal or unenforceable in any respect, then such provision shall be ineffective only to the extent of such prohibition or invalidity, and the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

24. **Enforcement**. This Agreement and all agreements relating to the subject matter hereof is the product of negotiation and preparation by and among each party with a complete opportunity to be reviewed by their respective counsel, and shall be construed accordingly.

25. **Relationship of Parties**. The relationship of the parties hereto shall be that of Seller and Purchaser of Accounts, and Purchaser shall not be a fiduciary of the Seller, although Seller may be a fiduciary of the Purchaser.

26. **Legal Fees.** Seller agrees to reimburse Purchaser on demand for:

    26.1. The actual amount of all costs and expenses, including reasonable attorneys' fees, credit card processing fees and/or any collections costs incurred by Purchaser, which Purchaser has incurred or may incur in:

        26.1.1. Administering this Agreement and any documents prepared in connection herewith;

        26.1.2. Any way arising out of or in connection with this Agreement, and whether or not arising out of a dispute which does not involve Purchaser.

    26.2. Protecting, preserving or enforcing any lien, including expenses incurred in filing relevant documents, security or other right granted by Seller to Purchaser or arising under applicable law, whether or not suit is brought, including but not limited to the defense of any Avoidance Claims or defense of Purchaser's lien priority.

    26.3. The actual costs, including photocopying, travel, and reasonable attorneys' fees and expenses incurred in complying with any subpoena or other legal process in any way relating to Seller. This provision shall survive termination of this Agreement.

    26.4. The actual amount of all costs and expenses, including reasonable attorneys' fees, which Purchaser may incur in enforcing this Agreement and any documents prepared in connection herewith, or in connection with any federal or state insolvency proceeding commenced by or against Seller, including those (i) arising out the automatic stay, (ii) seeking dismissal or conversion of the bankruptcy proceeding or (ii) opposing confirmation of Seller's plan there under.

27. **Confidentiality**. Seller agrees that the terms, the Purchaser's business methods and trade secrets, and any and all other records and information clearly and specifically identified by Purchaser as confidential will be held by Seller in strict confidence and treated as the confidential property of



Purchaser. Seller will not, except in the due performance of its duties or the enforcement of its rights under this Agreement, disclose any of the foregoing to any Person, unless specifically authorized to do so in writing by Purchaser or unless required by law. Purchaser agrees that any and all records and information clearly and specifically identified by Seller as confidential will be held by Purchaser in strict confidence and treated as the confidential property of Seller. Purchaser will not, except in the due performance of its duties or the enforcement of its rights under this Agreement, disclose the records and information of Seller to any Person, unless specifically authorized to do so in writing by Seller or unless required by law.

28. **Set-off Rights**. Purchaser shall have the right, but not the obligation, at any time and from time to time, without prior notice to Seller (any such notice being expressly waived by Seller) and to the fullest extent permitted by law, to set off against any amounts it owes to Seller under this Agreement or otherwise, those amounts owed to Purchaser or any Affiliate of Purchaser by the Seller. For the avoidance of doubt, Purchaser shall have the right to exercise its set off rights: (i) in lieu of the payment of amounts set forth in Section 2.1.5 with respect to Purchased Accounts; (ii) with respect to any Special Reserve Amount, as determined by Purchaser, in lieu of actual payment from Seller of such amount (with the amount of such set off added to the Required Reserve Account); and (iii) to decrease the Required Reserve Amount by the amount of any Obligations. Purchaser shall use commercially reasonable efforts to notify Seller as soon as practicable of any set off right that Purchaser has exercised in accordance with this Section 28.

29. **Entire Agreement**. No promises of any kind have been made by Purchaser or any third party to induce Seller to execute this Agreement. No course of dealing, course of performance or trade usage, and no parol evidence of any nature, shall be used to supplement or modify any terms of this Agreement.

30. **Choice of Law**. This Agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the State of Ohio.

31. **Jury Trial Waiver.** In recognition of the higher costs and delay which may result from a jury trial, the parties hereto waive any right to trial by jury of any claim, demand, action or cause of action (A) arising hereunder or, (B) in any way connected with or related or incidental to the dealings of the parties hereto or any of them with respect hereto, in each whether now existing or hereafter arising, and whether sounding in contract or tort or otherwise; and each party further waives any right to consolidate any such action in which a jury trial has been waived with any other action in which a jury trial cannot be or has not been waived; and each party hereby agrees and consents that any such claim, demand, action or cause of action shall be decided by court trial without a jury, and that any party hereto may file an original counterpart or a copy of this section with any court as written evidence of the consent of the parties hereto to the waiver of their right to trial by jury.

32. **Jurisdiction and Venue**. The parties further submit to the jurisdiction of the Courts of the State of Ohio, with venue at the Cuyahoga County Court of Common Pleas located in Cleveland, Ohio. In the event of removal to a Federal Court, such court shall be the District Court for the Northern District of Ohio, Eastern Division. Seller and Guarantors expressly waive the jurisdiction of any other court, and acknowledge and agree that this Agreement, without more, shall be sufficient to sustain the dismissal of an action commenced by Seller or Guarantors in any court other than specified in this Agreement. Seller and Guarantors agree that the said forums are convenient to them, and submit to the jurisdiction of said forums and waive any and all objections to jurisdiction or venue.

33. **Service of Process**. Seller agrees that Purchaser may effect service of process upon Seller by regular mail at the address set forth in this Agreement, or at the option of Purchaser, by service upon Seller's agent for the service of process.



34. **Assignment**. Purchaser may assign its rights and delegate its duties hereunder. Upon such assignment, Seller shall be deemed to have attorned to such assignee and shall owe the same obligations to such assignee and shall accept performance hereunder by such assignee as if such assignee were Purchaser. Seller shall not assign or delegate its duties hereunder without the prior written consent of Purchaser.

35. **Counterparts**. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument. Delivery of an executed counterpart of the signature page to this Agreement by facsimile or electronic mail shall be effective as delivery of a manually executed counterpart of this Agreement, and any party delivering such an executed counterpart of the signature page to this Agreement by facsimile or electronic mail to any other party shall thereafter also promptly deliver a manually executed counterpart of this Agreement to such other party, provided that the failure to deliver such manually executed counterpart shall not affect the validity, enforceability, or binding effect of this Agreement.

36. **Notice.**

36.1. All notices required to be given to any party other than Purchaser shall be deemed given upon the first to occur of (i) deposit thereof in a receptacle under the control of the United States Postal Service, (ii) transmittal by electronic means to a receiver under the control of such party, or (iii) actual receipt by such party or an employee or agent of such party. Notwithstanding the foregoing, all notices to Purchaser shall be deemed given only upon actual receipt by Purchaser's General Counsel.

36.2. For the purposes hereof, notices hereunder shall be sent to the following addresses, or to such other addresses as each such party may in writing hereafter indicate:

| | |
|---|---|
| **SELLER:** | **Shopno I, LLC** |
| Address: | 37-16 73rd Street, Suite 302<br>Queens, NY 11372 |
| Officer: | Faisal Farhana |
| Email: | Faisal@yourdreamhomecare.com |
| **PURCHASER:** | **Encore Funding II, LLC** |
| Address: | 30100 Chagrin Blvd., Suite 350<br>Pepper Pike, Ohio 44124 |
| Officer: | Matthew D. Williams, General Counsel |
| Email: | mwilliams@encore-funding.com |



IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

**SELLER**: Shopno I, LLC

By: *Faisal Farhana*
Name: Faisal Farhana
Its: Authorized Officer

**PURCHASER**: Encore Funding II, LLC

By: *Chad Eberly*
Name: Chad S. Eberly
Its: General Manager



# EXHIBIT A

# GENERAL RELEASE

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and adequacy of which are hereby acknowledged, the undersigned and each of them (collectively "Releasor") hereby forever releases, discharges and acquits Encore Funding II, LLC ("Releasee"), its parent, directors, shareholders, agents and employees, of and from any and all claims of every type, kind, nature, description or character, and irrespective of how, why, or by reason of what facts, whether heretofore existing, now existing or hereafter arising, or which could, might, or may be claimed to exist, of whatever kind or name, whether known or unknown, suspected or unsuspected, liquidated or unliquidated, each as though fully set forth herein at length, to the extent that they arise out of or are in way connected to or are related to that certain Factoring and Security Agreement dated _____.

    Releasor agrees that the matters released herein are not limited to matters which are known or disclosed, and the Releasor waives any and all rights and benefits which it now has, or in the future may have.

Releasor acknowledges that factual matters now unknown to it may have given or may hereafter give rise to Claims which are presently unknown, unanticipated and unsuspected, and it acknowledges that this Release has been negotiated and agreed upon in light of that realization and that it nevertheless hereby intends to release, discharge and acquit the Releasee from any such unknown Claims.

Acceptance of this Release shall not be deemed or construed as an admission of liability by any party released.

Releasor acknowledges that either (a) it has had advice of counsel of its own choosing in negotiations for and in the preparation of this release, or (b) it has knowingly determined that such advice is not needed.

DATED: _____


Individual Releasor:

_____
Faisal Farhana



Entity Releasor: Shopno I, LLC

_____
Name:  Faisal Farhana
Its:     Authorized Officer


Electronically Filed 02/14/2025 15:44 / / CV 25 112182 / Confirmation Nbr. 3407002 / CLTXT

Shopno I, LLC                                                                                                        Exhibit A



**Exhibit B**

The Fee Structure for the within Factoring and Security Agreement is as follows:

| | |
|---|---|
| Funding Fee Percentage: | 1.5% |
| Daily Fee Percentage: | .06% |
| Daily Fee Accrual Date: | On the 31st day from Purchase Date. |
| Periodic Fee Percentage: | N/A |
| Periodic Fee Accrual Date: | N/A |
| Late Charge Percentage: | .06% |
| Late Payment Date: | 90 days |
| Reserve Percentage: | 10% |
| Term: | 18 months |